ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL IV

| | | |
|---|---|---|
| LEONARDO FEBRES PIZARRO<br><br>Apelante<br><br>v.<br><br>MODEL OFFSET PRINTING<br><br>Apelado | KLAN202400714 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Humacao<br><br>Caso Número: HU2018CV01243<br><br>Sobre: Despido injustificado (Ley Núm. 80) y Otros |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Jueza Rivera Marchand y la Juez Barresi Ramos

Rivera Marchand, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 18 de diciembre de 2024.

Comparece el señor Leonardo Febres Pizarro (señor Febres Pizarro o apelante) y nos solicita la revocación de la *Sentencia,* notificada el 19 de julio de 2024, por el Tribunal de Primera Instancia, Sala Superior de Humacao (TPI o foro primario). En esta, el foro primario desestimó la totalidad de la causa de epígrafe, por la vía sumaria.

Por los fundamentos que exponemos a continuación, revocamos el dictamen apelado. Veamos.

**I.**

El señor Febres Pizarro instó una *Querella*[1] en contra de su antiguo patrono, Model Offset Printing (MOP o apelado), al amparo de la Ley Núm. 80 de 30 de mayo de 1976, según enmendada (29 LPRA secs. 185a y ss) y de la Ley Núm. 100 de 30 de junio de 1959, según enmendada (29 LPRA sec 146 y ss). Lo antes, acogiéndose al

---

[1] Apéndice, págs. 1-8 y 37-44.  La querella instada el 29 de octubre de 2018 fue enmendada el 1 de junio de 2023 a los efectos de corregir que la fecha de comienzo del querellante en MOP fue el 1 de enero de 1985, según admitió el señor Carlos Colón Figueroa durante su deposición y de aumentar la compensación reclamada a $73,867.32, las costas y honorarios de abogado.

procedimiento por la vía sumaria, según autoriza la Ley Núm. 2 de 17 de octubre de 1961, según enmendada. En esta, el apelante expuso que laboró en MOP, mediante contrato y por tiempo indeterminado, desde el 6 de abril de 1990 hasta su despido el 21 de marzo de 2018. Añadió que, fungió como operador de máquinas de placas en el Departamento de Pre-Prensa de la empresa apelada. Expuso además que, durante los años subsiguientes se "encargó" de la operación de la máquina "Xerox".

Alegó que, entre el 4 de noviembre de 2013 y el 23 de febrero de 2016 fue el único empleado sometido a una reducción de jornada laboral y aseguró que la mayoría de los empleados eran menores que él y de menor antigüedad en el empleo. Sostuvo que, tras el paso del Huracán María por Puerto Rico, en septiembre del año 2017, la empresa le informó que no había trabajo hasta nuevo aviso. Señaló que, en marzo de 2018, MOP reanudó su negocio con varios empleados de menor antigüedad que él, por lo que, cursó un requerimiento de información, al presidente de MOP, el señor Carlos Colón Figueroa (señor Colón Figueroa). Este le indicó (por correo electrónico el 9 de marzo de 2018) que, la obligación de re-emplearlo terminaba en seis meses contados a partir del 19 de septiembre de 2017. Conforme a lo anunciado por MOP, mediante carta fechada el 21 de marzo de 2018, dio por terminada la relación de empleo del apelante con la empresa.

Por entender que, MOP no observó el orden de antigüedad que exige la ley y por emplear a otra persona con menor edad a sustituirlo, el apelante incoó la presente causa sobre despido injustificado y por discrimen por edad.

Oportunamente, MOP acreditó su contestación a la querella, así como a la querella enmendada.[2] En esencia, negó las alegaciones en su contra y solicitó la desestimación de la querella en su

---

[2] Apéndice, págs. 9-36 y 45-72.

totalidad. Sostuvo que, debido a la disminución del volumen de los trabajos en el área de preparación y los avances tecnológicos en la industria, las tareas del apelante mermaron. Admitió que, le redujeron la jornada laboral al señor Febres Pizarro desde el 4 de noviembre de 2013 hasta el 23 de febrero de 2016. En particular, arguyó que la causa de acción, bajo la Ley Núm. 100, *supra*, se encuentra prescrita, por haber transcurrido más de un año, desde el ajuste en la jornada laboral.

De otra parte, adujo que el proceso de reempleo, tras el paso del Huracán María, fue en cumplimiento con la Ley de Transformación y Flexibilidad Laboral, Ley Núm. 4 de 26 de enero de 2017 (Ley Núm. 4), 29 LPRA secs. 121 *et seq.* Sostuvo que, no contrató ningún empleado regular en la posición de operador pre-prensa. Expuso que, hubo una reorganización de la empresa y que, de los empleados restituidos, cinco eran mayores que el apelante. Arguyó que, la edad del señor Febres Pizarro no fue un factor en la toma de decisiones del negocio. Por ello, y en ausencia de una reclamación que justifique la concesión de un remedio en ley, al amparo de la Regla 10.2 de las Reglas de Procedimiento Civil, 32 LPRA Ap. V., R. 10.2, MOP solicitó la desestimación de la causa.[3]

Así las cosas y culminado un extenso descubrimiento de prueba, MOP presentó una *Moción de Sentencia Sumaria* en la cual propuso 18 hechos estipulados, más 77 propuestas de hechos incontrovertidos.[4] Atribuyó el despido del apelante a una decisión

---

[3] Conforme surge de la *Minuta* correspondiente a una vista celebrada el 17 de agosto de 2021, el TPI declaró no ha lugar la solicitud de desestimación de la querella que instó MOP. Véase, Entrada núm. 32 en el expediente electrónico del portal del Sistema Unificado y Administración de Casos (SUMAC) del Poder Judicial.

[4] Véase, Apéndice, págs. 144-969. Fundamentó su postura al referirse a los siguientes anejos: 1. Toma de deposición del señor Carlos Colón Figueroa; 2. Toma de deposición del señor Leonardo Febres Pizarro celebrada el 27 de octubre de 2023; 3. Continuación de Toma de deposición del señor Leonardo Febres Pizarro celebrada el 29 de febrero de 2024; 4. Correo electrónico emitido el 9 de marzo de 2018 por el señor Miguel Colón Figueroa; 5. Carta emitida el 23 de febrero de 2016 por el señor Leonardo Febres; 6. Carta suscrita por el señor Miguel Colón Figueroa del 1 de marzo de 2016; 7. Notificación de terminación de empleo por haber transcurrido 6 meses de periodo de reserva de empleo; 8. Correo electrónico emitido el 5 de marzo de 2018 por el señor Leonardo Febres Pizarro; 9. *Head Count*

administrativa de reorganizar la empresa en base a las necesidades operacionales y de negocio existentes, cumpliendo así los requerimientos de la Ley 80, *supra*. Sobre el alegado discrimen por edad, correspondiente a la reducción de jornada laboral (efectuado entre el 4 de noviembre de 2013 hasta el 23 de febrero de 2016), MOP levantó como defensa la prescripción. En respuesta a la alegación del apelante sobre la retención de empleados con menor antigüedad, el apelado descartó que procediese la reinstalación del apelante, debido a que la Administración del Seguro Social (ASS) lo declaró incapacitado para trabajar, a partir del 1 de septiembre de 2017.

En reacción, el apelante se opuso al petitorio sumario de MOP.[5] Aseguró haber controvertido las propuestas de hechos

---

marcado; 10. Carta suscrita por el señor Leonardo Febres Pizarro del 31 de diciembre de 2014; 11. Notificación de reducción de jornada semanal de 5 de febrero de 2014; 12. Notificación de cesantía y asuntos relacionados; 13. *Audited financial statements* del 31 de diciembre de 2012; 14. 2018 *Annual Report*; 15. Manual del empleado; 16. Enmiendas al Manual del Empleado y Reglamento General; 17. Recibo de Manual de Empleados; 18. Recibo de enmiendas al Manual del Empleado y Reglamento General; 19. Recibo de enmiendas al Manual del Empleado y Reglamento General; 20. Carta a la señora Damarys García del 14 de marzo de 2018; 21. Decisión de la Administración del Seguro Social; 22. Carta al señor Luis. D. Vázquez del 4 de marzo de 2018; 23. Acuerdo de ajuste para consideración del asegurador; 24. Fotos del seguro; 25. Acuerdo de ajuste para consideración del asegurador; 26. *Income Statement* enero a junio de 2018; 27. Fotos del seguro; 28. Fotos del seguro; 29. Seguro; 30. Reparación de techo de oficina y almacén; 31. *Forensic engineering report*; 32. Fotos del seguro; 33. Fotos del seguro; 34. Fotos del seguro; 35. *Universal Insurance Company*; 36. *Universal Insurance Company*; 37. *Universal Insurance Company*; 38. Reparaciones *Suprasetter* H105; 39. Reparaciones SCL 105; 40. Reparaciones SM102-6P3L; 41. Reparaciones SM102-6P3 L; 42. Acuerdo de ajuste para consideración del asegurador; 43. Reparaciones *Suprasetter* SCL 105; 44. Contrato de compraventa a plazos; 45. Contrato de servicios Kodak; 46. PCP Formulario de cernimiento del proveedor;47. Reparaciones *Cutter* 115 ED; 48. Reparaciones *Cutter* 115ED; 49. *Income Statement* enero a diciembre de 2017; y 50. *Income Statement* enero a diciembre 2018.

[5] Véase, Apéndice, págs. 1033-1558. Junto a su *Oposición*, la parte apelante incluyó los siguientes documentos: Anejo 1-Cartas enviadas por el señor Carlos Colón Figueroa dirigida al señor Joel Rosado del 1 de marzo de 2018 y otra dirigida al señor Luis D. Vázquez del 14 de marzo de 2018; Anejo 2-Carta enviada por el señor Carlos Colón dirigida a la señora María R. Castro del 22 de marzo de 2018; Anejo 3-Carta enviada por el señor Carlos Colón dirigida a la señora Damarys García del 14 de marzo de 2018; Anejo 4-Cartas de reempleo cursadas a empleadas de MOP; Anejo 5-Declaración Jurada suscrita por el señor Leonardo Febres Pizarro; Anejo 6-Certificación de Xerox; Anejo 7-Carta cursada por el señor Leonardo Febres del 23 de febrero de 2016; Anejo 8-Comunicación emitida por el señor Miguel Colón Figueroa del 1 de marzo de 2016; Anejo 9-Deposición del señor Leonardo Febres Pizarro de 29 de febrero de 2024; Anejo 10-Tabla sobre posiciones asignadas; Anejo 11-Contestación a Primer Pliego de Interrogatorio y Requerimiento de Documentos de la querellada MOP; Anejo 12-Certificado sobre años de servicios al señor Leonardo Febres Pizarro del 16 de noviembre de 2012; Anejo 13-Carta suscrita por el señor Carlos Colón Figueroa del 21 de marzo de 2018; Anejo 14-Certificado de nacimiento del señor Leonardo Febres Pizarro; Anejo 15-Talonario de pago de MOP al señor Leonardo Febres Pizarro el 23 de junio de 2017; Anejo 16-Toma de Deposición del señor Carlos Colón Figueroa del

números: 19-22, 24-26, 28, 31-39, 43-45, 51-52, 54, 56, 59, 60(g), 60(h), 60(i), 60(k), 62-64 y 77. Planteó que, en este caso persisten controversias medulares que impiden la adjudicación de la causa por la vía sumaria.[6]

Evaluado lo antes, el TPI declaró ha lugar el petitorio sumario promovido por MOP y dictó la *Sentencia* apelada mediante la cual desestimó la causa con perjuicio. En esta, consignó 90 determinaciones de hechos, de las cuales resaltamos las siguientes:

> [...]
> 5.Desde que comenzó a trabajar para la querellada, el querellante trabajó como operador de máquina de placas en el Departamento de pre-prensa de la querellada.
> 6.Efectivo el 4 de noviembre de 2013 se le redujo al querellante la jornada de trabajo semanal a tres (3) días semanales. No obstante, las partes discrepan sobre el periodo de duración de dicha reducción.
> 7.El último día hábil de trabajo del querellante fue el 19 de septiembre de 2017.
> 8.Para dicha fecha el querellante trabajaba una jornada regular de cinco (5) días a la semana, de lunes a viernes.
> 9.El 20 de septiembre de 2017, y durante los días y semanas subsiguientes, el querellante y sus compañeros de trabajo no trabajaron debido a que la querellada como resultado del paso del huracán María se vio impedida de operar.
> 10.Esto es, a raíz del paso del huracán María, la querellada le informó verbalmente el 19 de septiembre de 2017 al querellante y a otros empleados que no habría trabajo hasta nuevo aviso.
> 11.El querellante le escribió a MOP el 5 de marzo de 2018 para indagar sobre su empleo.
> 12.Mediante correo electrónico de 9 de marzo de 2018, se le informó al querellante la intención de no llenar las plazas vacantes y se le advirtió que la obligación de re[-]emplearlo terminaba los seis (6) meses, o sea, hasta el 19 de septiembre de 2017, por lo que [,] de no recibir [...] notificación antes del 19 de marzo de 2018[,] e[ra] probable que no ser[ía] re[-]empleado.

---

23 de mayo de 2023; Anejo 17-Toma de Deposición del señor Leonardo Febres Pizarro de 27 de octubre de 2023; Anejo 18-Amonestaciones dadas al señor Leonardo Febres Pizarro; Anejo 19-Carta a manuscrito cursada por el señor Leonardo Febres Pizarro del 31 de diciembre de 2014; Anejo 20-Carta cursada por el señor Miguel Colón Figueroa del 5 de febrero de 2014; Anejo 21-Carta cursada por el señor Carlos Colón Figueroa al señor Leonardo Febres Pizarro del 7 de noviembre de 2017; Anejo 22-Correo electrónico cursado por el señor Leonardo Febres Pizarro dirigido al señor Carlos Colón Figueroa del 5 de marzo de 2018; Anejo 23-Correo electrónico cursado por el señor Miguel Colón Figueroa dirigido al señor Leonardo Febres Pizarro del 9 de marzo de 2018; Anejo 24-Notificación de terminación de empleo cursadas emitidas por el señor Carlos Colón Figueroa y dirigidas al señor Leonardo Febres Pizarro, al señor Vicente Vázquez Collazo y a la señora Maribel Ramírez, respectivamente, el 21 de marzo de 2018; Anejo 25-*Annual Report* 2017 y 2018; Anejo 26-Planilla de Contribución sobre Ingresos para Negocios Exentos bajo el Programa de Incentivos de Puerto Rico Desarrollo Industrial del año 2017 de la querellada MOP; Anejo 27- Planilla de Contribución sobre Ingresos para Negocios Exentos bajo el Programa de Incentivos de Puerto Rico Desarrollo Industrial del año 2018 de la apelada MOP; Anejo 28-Comprobante de retención del señor Carlos Colón Figueroa para los años 2017 y 2018 y Anejo 29- Comprobante de retención del señor Miguel Colón Figueroa para los años 2017 y 2018.
[6] Apéndice, pág. 1021.

13. Previo a su cesantía y subsiguiente despido, el querellante le daba mantenimiento a la máquina de hacer placas y de preparar muestras, cuando fuese necesario.

14. Las funciones que el querellante realizaba en el Departamento de Pre-Prensa le fueron asignadas a Luis Daniel Vázquez de aproximadamente, cuarenta y tres (43) años y con menos antigüedad que el querellante.

15. El 31 de diciembre de 2013 el querellante le solicit[ó] a MOP la razón para la reducción de su jornada de trabajo.

16. El 5 de febrero de 2014 MOP le entreg[ó] al querellante carta sobre "Notificación reducción jornada semanal" [.]

17. A la fecha de la efectividad de su despido, el 19 de septiembre de 2017 el querellante devengaba $9.77 por hora y trabajaba en una jornada regular semanal de cinco (5) días de lunes a viernes.

18. El 21 de marzo de 2018, la querellada le notificó al querellante carta titulada "Notificación Terminación de empleo por haber tra[n]scurrido 6 meses de periodo de reserva de empleo".

19. Desde que comenzó a trabajar para la querellada, el querellante trabajó como operador de máquina de placas en el Departamento de pre-prensa de la querellada realizando negativos, montajes de negativos y placas.

[...]

24. El querellante no radic[ó] una querella interna de discrimen por edad bajo la política de Igualdad de Derechos incluida en el Manual de Empleados durante su empleo en MOP.

25. Tampoco radic[ó] una querella por discrimen ante el Departamento del Trabajo.

[...]

27. El 7 de noviembre de 2017 MOP le curs[ó] al resto de sus empleados, incluyendo al querellante, notificación titulada "Notificación de Cesantía y asuntos relacionados", la cual lee como sigue:

Estimado empleado de MOP: Primero que todo, esperamos que te encuentres bien al igual que tu familia, Como sabes, desde el pasado 20 de septiembre de 2017 no hemos podido reanudar operaciones por los daños causados por el huracán María. Nuestras facilidades se vieron seriamente afectadas. Al presente nos encontramos en un periodo de limpieza y reparación y estimamos que tardaremos un tiempo adicional por lo que queremos compartir contigo la siguiente información: 1. Debido a tu cesantía efectiva el miércoles, 20 de septiembre de 2017 al presente, eres elegible a los beneficios de desempleo estatales y al fon[d]o especial federal por desempleo causado por el Huracán María (DUA). Debes solicitar ambos beneficios por conducto del Departamento del Trabajo de Puerto Rico en o antes del 13 de noviembre de 2017, si no lo has hecho todavía. 2. A medida que sea posible, estaremos notificándole a los empleados por correo y mensaje de texto, la oportunidad de reempleo, cuando surja la necesidad, lo cual tampoco podemos garantizar. 3. La determinación de reempleo se hará por clasificación ocupacional siguiendo el orden de antigüedad que tenga el empleado en la compañía. Es por esto, que es sumamente importante que te asegures que tenemos tu dirección postal, correo electrónico y teléfono correcto y actualizado. Puedes comunicarte vía correo electrónico a sales@printmop.com o al (787)850-3000 para notificarnos cualquier cambio o modificación que haya ocurrido y ocurra en o antes del 20 de marzo de 2018. 4. Una vez recibas la notificación de reempleo tendrás 5 días laborales para reintegrarte a trabajar o perderás la oportunidad de reempleo. [E]n dicha circunstancia procederemos a notificarle al empleado próximo en el listado de antigüedad, dentro de tu clasificación ocupacional. 5. La obligación de reempleo

terminar[á] a los 6 meses de la cesantía. O sea, el 20 de marzo de 2018. Posterior a dicha fecha, cesaría automáticamente tu relación obrero-patronal con MOP. [...] En caso de duda o pregunta favor de comunicarte conmigo a tu conveniencia. Atentamente, Carlos Colón Presidente

[...]

30. Uno de los obstáculos mayores confrontados por MOP, fue la falta de energía eléctrica. MOP estuvo sin energía eléctrica necesaria para operar su negocio desde el 20 de septiembre de 2017 al 11 de diciembre de 2017 cuando regres[ó] el servicio eléctrico.

31. Pero aun luego de reestablecido el servicio, el mismo regres[ó] con cierto nivel de inconsistencia. Sin energía eléctrica no era posible determinar los daños a los equipos.

[...]

33. Meses después del paso del huracán María MOP comenzó lentamente a reanudar sus operaciones productivas en la medida que le fue permitido. Pero no fue hasta que el servicio energético fue reestablecido que MOP pudo comenzar a probar los equipos[.]

[...]

35. Finalmente, en enero de 2018 que MOP comenzó el proceso de reempleo de los empleados suspendidos por el cierre de sus operaciones.

36. El 5 de marzo de 2018 el querellante le envió un correo electrónico al Sr. Carlos Col[ó]n el cual lee como sigue:

"Sr. Carlos Col[ó]n[.] Espero que todo esté bien y se encuentre bien de salud. Por este medio quiero informarle que, aunque ustedes están trabajando, sigo en espera del comienzo oficial para empezar a trabajar. Como ya habíamos hablado anteriormente en el mes de febrero comenzaríamos en el mes o antes de marzo y [e]stoy esperando mi trabajo. Gracias, quedo de usted."

37. El 9 de marzo de 2018, Miguel Col[ó]n, en representación de MOP le contest[ó] al querellante mediante correo electrónico lo siguiente:

"Desafortunadamente no podemos estimar la fecha en la que tendremos la necesidad de reclutar nuevamente un empleado regular en la posición que ocupaba, al igual que nos ocurre en relación a otras posiciones también afectadas por la reducción de personal que tuvimos que llevar a cabo a consecuencia de los efectos del huracán María a nuestras operaciones y a la de nuestros clientes. Ejemplo de otras posiciones afecta[da]s son: Cotizador, Servicio al Cliente, Vendedor y Contable. De hecho, una de las posiciones aun vacante era ocupada por la hija del presidente de nuestra Empresa. Esta información la comparto para que pueda entender la situación en que nos encontramos. Nuestra decisión de no llenar las plazas vacantes está basada en la sana administración de la empresa y no es una arbitraria ni caprichosa. Pensábamos que para esta fecha tendríamos el volumen comercial necesario para reemplazar a la mayoría de los empleados cesanteados, incluyéndote, pero lamentablemente no ha sido así. En este momento las funciones esenciales que realizabas de la impresión de placas y la elaboración de muestras y que ocupaban más del 80% de tu tiempo en el Departamento de Pre[-]prensa son inexistentes. De igual forma, es mínimo el trabajo relacionado a las impresiones en el equipo Xerox que esporádicamente realizabas, lo cual no amerita un empleado solo para esa labor. Agradecemos su interés y de surgir algún cambio en la situación del volumen de negocio le dejaremos saber. Sin embargo, para fines de claridad le adelanto que según la ley nuestra obligación de reempleo termina a los 6 meses de la cesantía. O sea, a partir del 19 de septiembre de 2017, por lo que de no

recibir nuestra notificación antes del 19 de marzo de 2018 es probable que no será re-empleado".[sic]

38. El 19 de marzo de 2018 concluy[ó] el t[é]rmino de reserva en el cual MOP estaba obligado bajo la Ley 80 a reservarle el empleo al querellante o re[-]emplearlo de haber tenido la necesidad de contratar a un empleado regular en su clasificación. Esto es, "Operador de Pre-Prensa".

39. Al 19 de marzo de 2018 MOP no tenía la necesidad de contratar a un empleado regular para realizar las funciones del querellante, como operador de pre-prensa.

40. M[á]xime cuando la máquina de placas había sufrido daños, y no estaba funcionando al 100%, lo que requirió varias reparaciones y su eventual reemplazo.

41. Mediante carta fechada el 21 de marzo de 2018 titulada "Notificación terminación de empleo por haber transcurrido 6 meses de periodo de reserva de empleo" MOP le notificó al querellante lo siguiente:

"El 19 de marzo de 201[8] fue su último día de trabajo pues tuvimos que cerrar operaciones por motivo del paso del huracán Mar[í]a por Puerto Rico el 20 de septiembre de 2017. Desde entonces no hemos podido reanudar nuestras operaciones al 100% de nuestra capacidad. El efecto del huracán Mar[í]a en nuestras facilidades y operaciones, así como en las de nuestros clientes fue significativo. A medida que ha sido posible, hemos cubierto algunas de las posiciones siguiendo el orden de antigüedad, según establece la ley. No obstante, y pese a nuestras gestiones, al día de hoy no hemos podido levantar el volumen comercial necesario que justifiquen cubrir su posición y reemplazarlo. La ley establece un periodo de 6 meses de reserva de empleo desde la fecha de la cesantía para re-emplear a los empleados cesanteados. El t[é]rmino de 6 meses venció ayer lunes, 19 de marzo de 2018. Al momento de la cesantía le liquidamos todos los días de licencia por vacaciones acumulados y salarios devengados al 19 de septiembre de 2017 por lo que no procede ninguna liquidación. Le agradecemos sus servicios y deseamos éxito en el futuro. Atentamente, Carlos Col[ó]n Presidente" (Énfasis suprimido.)

42. La máquina de impresión de placas (Supprasetter) sufrió daños significativos.

[...]

44. Aun así, MOP se vio forzado a comprar un equipo nuevo, pues nunca función[ó] al 100% por los daños a dicho equipo durante el paso del huracán Mar[í]a.

45. Las labores de mantenimiento piezas y servicios de la máquina de impresión de placas que realizaba el querellante fueron subcontratadas, cuando MOP adquirió la nueva máquina de impresión de placas.

46. MOP determin[ó] consolidar las tareas de pre-prensa y asignarle las tareas que realizaba el querellante al Especialista de Pre-prensa, Luis Daniel V[á]zquez.

47. Luis Daniel V[á]zquez ocupaba una posición exenta como Especialista de Pre-prensa.

48. MOP le notificó a V[á]zquez la oportunidad de reempleo mediante carta fechada el 14 de marzo de 2018.

49. Carlos Col[ó]n asumió las funciones de cotizar los trabajos de impresión que realizaba Vicente Vázquez, supervisor de Pre-prensa, cuya posición también fue eliminada.

50. Los trabajos de impresión en la m[á]quina Xerox Nuvera que surgieron esporádicamente durante el periodo de reserva, fueron realizados por los empleados disponibles y solo cuando fuese necesario.

51. Nunca ha habido una persona encargada de la m[á]quina Xerox Nuvera.

52. Las funciones relativas al manejo de equipo de placas estuvieron en pausa hasta luego del 20 de marzo de 2018 debido a desperfectos del equipo. Posteriormente, MOP adquirió un equipo nuevo de impresión de placas con servicio y mantenimiento on-site incluidos. La impresión en equipo Xerox, por poco volumen, siempre fue una labor incidental que el querellante nunca manej[ó] de forma exclusiva. Dichas labores las continúan ejerciendo otro personal que utilizaban el equipo mientras el querellante era empleado de la empresa.

53. La decisión de MOP de no re-emplear al querellante se debió únicamente a que para la fecha en que concluy[ó] el periodo de reserva, el 20 de marzo de 2018 MOP no había podido levantar el volumen comercial de los trabajos de pre-prensa para justificar una posición regular a tiempo completo de operador de pre-prensa, que ocupaba el querellante.

[…]

55. El querellante no fue el único empleado cuya posición se eliminó. MOP también elimin[ó] la posición de Recepción, Servicio al Cliente, y Supervisor de Pre-prensa y del querellante.

[…]

61. La reducción de empleo alegada por el querellante por la cual alega MOP discrimin[ó] por edad en su contra, ocurrió el 4 de noviembre de 2013.

62. El 31 de diciembre de 20132 [sic] el querellante le solicitó a MOP una carta explicándole los motivos de dicha reducción por escrito.

63. El 5 de febrero de 2014 mediante carta fechada ese mismo día MOP le explicó nuevamente al querellante, por escrito y según solicitado por éste, los motivos de dicha reducción, los cuales según indicado en la carta fueron los siguientes:

> Conforme es de su conocimiento desde hace algún tiempo nuestra empresa ha sufrido una merma en sus ganancias, debido a la crisis económica que afecta a nuestra isla e industria. Por lo que hemos realizado varios ajustes para mitigar dicho efecto y poder sobrepasar la misma. Entre las medidas tomadas, hemos reducido gastos, eliminado varias plazas regulares y modificado nuestra forma de operar. No obstante, las anteriores medidas no han sido suficientes por lo que decidimos efectivo el 4 de noviembre de 2013 reducirle su jornada semanal de empleo a tres (3) días, entendiéndose los días, lunes, miércoles y viernes en el horario de 8:00 am a 4:30 pm. Usted continuar[á] devengando el mismo tipo de salario por hora que al presente, realizando las mismas funciones y bajo la misma supervisión. Confiamos que dicha reducción en su jornada semanal sea temporera y que pronto surja nuevamente la necesidad de sus servicios que justifique la contratación de un empleado con una jornada semanal completa en su clasificación. Aunque según le consta en nuestra empresa no hay garantía de salario semanal ni diaria por lo que la anterior medida no representa un cambio en los términos y condiciones de su empleo.

64. La reducción de jornada estuvo motivada en la reducción de las tareas del querellante debido a los cambios operacionales y tecnológicos y volumen de trabajos de pre-prensa.

65. El querellante aleg[ó] en su deposición que el alegado trato discriminatorio alegado en la querella se ref[ería] a la reducción temporera de horas.

66. También el querellante aleg[ó] en su deposición que las acciones de discrimen se basan en lo siguiente:

a. Que en el 2016 alguien dijo que le subieran la velocidad a la m[á]quina dobladora cuando él la estaba trabajando, pero no sabe quién

    i. El querellante pudo hacer el trabajo.

    ii. El querellante cuestion[ó] dich[a] alegada instrucción.

b. Que no lo llamaron para revisar la m[á]quina dobladora cuando empezaron a probar los equipos, pero s[í] llamaron a Benito que era un doblador.

c. Que no lo llamaron para revisar la máquina de placas cuando empezaron a probar los equipos.

d. Por *Warning* que le dieron en el 2014 porque impresora se quedó sin tinta ya que entiende que como él no era la única persona que trabajaba la Xerox Nuvera debieron [sic] no procedía disciplina.

e. Porque en una ocasión se le llamo la atención porque se fue a desayunar con Luis Daniel V[á]zquez y llego tarde al trabajo, pero no disciplinaron a Luis Daniel V[á]zquez.

    i. Luis Daniel V[á]zquez era un empleado exento.

    ii. Eso ocurrió más de 1 año antes del 2017.

67. El querellante era el único operador de pre-prensa. Por lo que fue el único empleado afectado por dicha reducción debido a la merma en la necesidad de sus tareas. No había ningún otro operador de pre-prensa en ese momento.

[...]

69. La reducción de jornada del querellante dur[ó] del 4 de noviembre de 2013 al 23 de febrero de 2014, no hasta el 2016, luego de la cual el querellante regres[ó] a trabajar una jornada semanal de cinco (5) días.

[...]

71. Al adquirirse equipo de impresión de placas se eliminó la necesidad de utilizar cámaras y cuartos oscuros para el revelado de negativos. En un principio la máquina de placas utilizaba químicos para revelar las placas. Este proceso se hizo innecesario al adquirir placas con auto revelado.

72. El querellante declar[ó] que MOP hac[í]a reducciones esporádicas que aplicaba también a otros empleados.

73. En su deposición el querellante declar[ó] lo siguiente en cuanto a las funciones que realizaba en el 2017 hasta su cesantía por el paso del Huracán Mar[í]a:

a. Admite que sus funciones principales eran en pre-prensa y las copias en la m[á]quina [X]erox

b. Lo primero que hacía cuando llegaba al trabajo era verificar el itinerario de los trabajos que se trabajarían ese día que lo preparaba la supervisora de producción y prendía la máquina de placa.

c. Admite que la máquina de revelado a la que le daba mantenimiento cada 2 o 3 meses fue eliminada antes del Huracán Mar[í]a.

d. Admite que la máquina que sustituy[ó] la máquina de revelado requería el siguiente mantenimiento:

    i. Rellenar máquina – 25 minutos diarios

    ii. Sacar papel de la máquina – 10 a 15 minutos diarios

    iii. Limpiar rolos – cuando fuese necesario, y duraba un máximo de 2 horas y media. No lo hacía diariamente.

    iv. Sacar residuos – 1 vez al mes. De 10 a 15 minutos.

e. En pre-prensa el querellante hac[í]a las pruebas para impresión

    i. Luis Daniel V[á]zquez también hac[í]a pruebas a veces.

    ii. Querellante le daba las pruebas a Luis Daniel V[á]zquez para su revisión.

f. También liberaba las placas en pre-prensa.

i. Luis Daniel V[á]zquez también hac[í]a este trabajo.

g. Máquina de pruebas – aunque no recuerda si estas máquinas estaban operando en septiembre de 2017.

h. Ayudaba a veces a los empleados de terminaciones.

i. No en la m[á]quina Kugler.

ii. Máquina para hacer espirales, pero pocas veces porque el volumen no era alto.

iii. Horizon Book Binder – no recuerda trabajarla en el 2017.

iv. Horizon Trimmer – Nunca la trabajó.

v. Shrink Wrap – No recuerda trabajarla en el 2017.

vi. Poly Wrap – Nunca la trabajó.

vii. Bound Drill – No recuerda trabajarla en el 2017.

viii. Round Corner - No recuerda trabajarla en el 2017.

ix. Dobladora:

1. Regular – La trabaj[ó] en algunas ocasiones ayudando a empleado de terminaciones.

2. Insertar – No recuerda ayudar en esa máquina en el 2017.

x. Guillotina – Tal vez en el 2017 ayud[ó] a realizar 2 trabajos en esta máquina (pág.90).

i. Trabajaba esporádicamente en máquina de troqueles en producción ayudando a Armando Fontánez.

j. Buscaba trabajos en archivo que requerían ser repetidos.

k. Alega hac[í]a placas, pero no se acuerda de la frecuencia con que las hacía.

l. Desde antes de septiembre de 2017 ya no hacía negativos.

m. Los trabajos de la m[á]quina Xerox Nuvera los asignaba José Lara y luego Pedro Muñoz y podía ser a él o a Damar[y]s García.

i. El querellante no asignaba ni hac[í]a el itinerario de los trabajos de la m[á]quina Xerox Nuvera.

74. El querellante admitió que en septiembre de 2017 la mayoría de los trabajos de pre-prensa eran industriales repetitivos y que los trabajos nuevos de hojas sueltas eran esporádicos.

75. En su deposición el querellante admitió que Luis Daniel V[á]zquez era quien trabajaba los programas de computadora, y que, aunque hizo algunos trabajos s[ó]lo podía hacer los más sencillos.

76. El querellante no hac[í]a todos los trabajos que hacía Luis Daniel V[á]zquez, pero Luis Daniel V[á]zquez hac[í]a trabajos que hac[í]a el querellante.

77. Los trabajos principales que se hacían en la Xerox – Nuvera eran las corridas de CRIM, que desde el 2017 se hac[í]a 1 sola vez al año, en vez de dos.

78. En las corridas de CRIM trabajaban varios empleados, incluyendo a Damar[y]s Garc[í]a, entre otros empleados.

79. El querellante por lo general trabajaba en el primer turno y Damar[y]s Garc[í]a trabajaba en el 2ndo turno.

80. El querellante no trabajaba todos los días con la m[á]quina Xerox Nuvera.

81. La Sra. Damar[y]s Garc[í]a trabajaba en terminaciones.

82. Todos los días hay trabajos de terminaciones en MOP.

83. Damar[y]s Garc[í]a también trabajaba en la m[á]quina Xerox Nuvera.

84. El 20 de abril de 2021 el querellante solicit[ó] los beneficios de Seguro Social por Incapacidad ante la Administración del Seguro Social (ASS).

85. El 21 de agosto de 2021 la ASS le notificó al querellante que habían determinado que estaba incapacitado para trabajar desde el 1 de septiembre de 2017.

86. El querellante no apeló la determinación emitida por la ASS el 21 de agosto de 2021.

[...]

89. El querellante aleg[ó] en su deposición que su despido fue injustificado porque:

 a. Si había trabajo para prensista también para [é]l porqué [sic] [é]l facilitaba el trabajo al prensista.

 b. Él podía ayudar en la guillotina y la dobladora a los empleados de terminaciones.

90. El querellante declaró que su alegación de que alegar que no había volumen de negocio para contratarlo era un pretexto porque no había pasado suficiente tiempo desde que MOP reanud[ó] sus operaciones.

En referencia a lo anterior, concluyó que MOP demostró que el despido fue por justa causa, lo cual tuvo el efecto de derrotar la causa instada bajo la Ley Núm. 100, *supra.* Resolvió, además que, el querellante no tiene derecho a una compensación al amparo de la Ley Núm. 80, *supra*, toda vez que MOP logró establecer la legalidad de su despido.

Inconforme, el señor Febres Pizarro acude ante esta Curia y señala los siguientes errores:

Declarar ha lugar la moción de sentencia sumaria presentada por la apelada y dictar sentencia sumariamente en la que desestimó todas las reclamaciones del apelante, a pesar de existir controversias de hechos esenciales respecto a la justificación del despido del apelante y al ánimo discriminatorio de dicho despido.

Al justificar las actuaciones de la apelada que condujeron al despido injustificado y discriminatorio del apelante aduciendo que constituían una *gestión legítima de negocio*, desconociendo por completo que dichas actuaciones fueron contrarias a la ley y la jurisprudencia que preceptúan como injustificado y discriminatorio un despido que se realiza en tales circunstancias.

El 28 de agosto de 2024, la parte apelada acreditó su alegato en oposición en la que, expuso su postura sobre los errores señalados por el apelante. Además, planteó que, ante la declaración de incapacidad del señor Febres Pizarro, (notificada por la Administración Federal del Seguro Social), la presente *Apelación* resulta académica, por lo que, a su entender, procede la desestimación de ésta. En cumplimiento con nuestra *Resolución*, (emitida el 5 de septiembre de 2024), el apelante, mediante *Moción*

*en Cumplimiento de Orden* el 16 de septiembre de 2024, acreditó su oposición a la solicitud de desestimación.  En respuesta, MOP instó su *Replica a Moción en Cumplimiento de Orden,* el 30 de septiembre de 2024. Con el beneficio de las posturas de las partes, procedemos a resolver.

**II.**

### A. Sentencia Sumaria

El mecanismo de sentencia sumaria provisto en la Regla 36 de Procedimiento Civil de 2009, 32 LPRA Ap. V, R.36, permite a los tribunales disponer, parcial o totalmente, de litigios civiles en aquellas situaciones en las cuales no existe controversia real y sustancial de un hecho material que requiera ventilarse en un juicio plenario, por lo cual solo resta aplicar el derecho. *Cruz Cruz y otra v. Casa Bella Corp. y otros,* 2024 TSPR 47, resuelto el 8 de mayo de 2024; *Birriel Colón v. Econo y otros*, 2023 TSPR 120, resuelto el 3 de octubre de 2023. Este mecanismo lo puede utilizar la parte reclamante o aquella parte que se defiende de una reclamación. Reglas 36.1 y 36.2 de las Reglas de Procedimiento Civil, 32 LPRA Ap. V, R. 36.1 y 36.2.

Mediante el mecanismo de sentencia sumaria, se procura profundizar en las alegaciones para verificar si, en efecto, los hechos ameritan dilucidarse en un juicio. *León Torres v. Rivera Lebrón,* 204 DPR 20, 42 (2020). Este cauce sumario resulta beneficioso tanto para el tribunal, como para las partes en un pleito, pues agiliza el proceso judicial, mientras simultáneamente provee a los litigantes un mecanismo procesal encaminado a alcanzar un remedio justo, rápido y económico. *Serrano Picón v. Multinational Life Ins.,* 212 DPR 981, 992 (2023).

Como se sabe, procede dictar sentencia sumaria si se desprende de las alegaciones, deposiciones, declaraciones juradas, contestaciones a interrogatorios, admisiones ofrecidas, entre otros,

que no existe controversia real sustancial sobre un hecho esencial y pertinente, y siempre que el derecho aplicable así lo justifique. *González Meléndez v. Mun. San Juan et al.,* 212 DPR 601, 610-611 (2023).

De manera que, en aras de prevalecer, la parte promovente debe presentar prueba incontrovertible sobre todos los elementos indispensables de su causa de acción. *Segarra Rivera v. Int'l Shipping et al.,* 208 DPR 964 (2022). Por ello, una parte demandada puede solicitar sentencia sumaria ante la insuficiencia de prueba sobre todos los elementos indispensable de su causa de acción. *Íd.* El promovente de la referida solicitud debe demostrar que: 1) la vista es innecesaria; 2) el demandante no cuenta con evidencia suficiente para probar algún hecho esencial, y 3) como cuestión de derecho procede la desestimación de la reclamación. *Ramos Pérez v. Univisión* 178 DPR 200, 217-218 (2010); *Medina v. M.S. & D. Química P.R., Inc.,* 135 DPR 716 (1994). Para ello, es indispensable que se le haya brindado al promovido amplia oportunidad para realizar un descubrimiento de prueba adecuado. *Íd.*

Nuestro ordenamiento civil y su jurisprudencia interpretativa impone unos requisitos de forma con los cuales hay que cumplir al momento de presentar una solicitud de sentencia sumaria, a saber: (1) una exposición breve de las alegaciones de las partes; (2) los asuntos litigiosos o en controversia; (3) la causa de acción sobre la cual se solicita la sentencia sumaria; (4) una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal; (5) las razones por las cuales se debe dictar la sentencia, argumentando el

derecho aplicable, y (6) el remedio que debe ser concedido. *Oriental Bank v. Caballero García,* 212 DPR 671, 679 (2023); Regla 36.3 de las Reglas de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3.

Nótese que, si el promovente de la moción incumple con estos requisitos, "el tribunal no estará obligado a considerar su pedido". *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 111 (2015). Además, el promovente de una solicitud de sentencia sumaria ha de acompañar su petitorio con prueba de la cual surja preponderantemente la ausencia de controversias sobre los hechos medulares del caso. *Birriel Colón v. Econo y otros,* supra.

Cabe destacar que, "la parte que desafía una solicitud de sentencia sumaria no puede descansar en las aseveraciones o negaciones consignadas en su alegación". *León Torres v. Rivera Lebrón,* supra, pág. 43. Por el contrario, la Regla 36.3(c) de las Reglas de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3(c), obliga a quien se opone a que se declare con lugar esta solicitud a enfrentar la moción de su adversario de forma tan detallada y específica como lo ha hecho el promovente puesto que, si incumple, corre el riesgo de que se dicte sentencia sumaria en su contra, si la misma procede en derecho. *Íd.* A esos efectos, deberá sustentar con evidencia sustancial los hechos materiales que entiende están en disputa. *Birriel Colón v. Econo y otros,* supra.

Por ello, en la oposición a una solicitud de sentencia sumaria, el promovido debe detallar aquellos hechos propuestos que pretende controvertir y, si así lo desea, someter hechos materiales adicionales que alega no están en disputa y que impiden que se dicte sentencia sumaria en su contra. *León Torres v. Rivera Lebrón,* supra. Claro está, para cada uno de estos supuestos, deberá hacer referencia a la prueba específica que sostiene su posición, según exigido por la Regla 36.3(d) de las Reglas de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3(d). En otras palabras, la parte opositora tiene el peso de

presentar evidencia sustancial que apoye los hechos materiales que alega están en disputa. *Íd.*

Cabe puntualizar que, a tenor de la normativa aplicable, si la parte promovida opta por no oponerse al petitorio sumario, conforme a las Reglas de Procedimiento Civil, *supra,* se arriesga a que el TPI dicte sentencia en su contra, si procede en derecho. Véase, Regla 36.3(c) de las Reglas de Procedimiento Civil, *supra; León Torres v. Rivera Lebrón,* supra. Entiéndase que, el mero hecho de que la parte promovida no presente una oposición o, de presentarla, no cumple con las formalidades de la Regla 36 de Procedimiento Civil de 2009, *supra,* ello no obliga al juzgador de los hechos a automáticamente disponer del asunto por la vía sumaria. *SLG Zapata-Rivera v. J.F. Montalvo,* 189 DPR 414, 432 (2013). Lo antes está sujeto a la sana discreción del Tribunal. *Íd.*, págs. 432-433.

Al atender la solicitud, el Tribunal deberá asumir como ciertos los hechos no controvertidos que se encuentren sustentados por los documentos presentados por el promovente. *E.L.A. v. Cole,* 164 DPR 608, 626 (2005). Toda inferencia razonable que pueda surgir de los hechos y de los documentos se debe interpretar en contra de quien solicita la sentencia sumaria, pues sólo procede si bajo ningún supuesto de hechos prevalece el promovido. *Íd.*, pág. 625. Además, al evaluar los méritos de una solicitud de sentencia sumaria, el juzgador debe actuar guiado por la prudencia y ser consciente en todo momento que su determinación puede conllevar el que se prive a una de las partes de su "día en corte", componente integral del debido proceso de ley. *León Torres v. Rivera Lebrón,* supra, pág. 44.

Sin embargo, la sentencia sumaria generalmente no procederá cuando existan controversias sobre hechos esenciales materiales, o si la controversia del caso está basada en elementos subjetivos como intención, propósitos mentales, negligencia o

credibilidad. *Cruz Cruz y otra v. Casa Bella Corp. y otros,* supra. Además, existen casos que no se deben resolver mediante sentencia sumaria porque resulta difícil reunir la verdad de los hechos mediante declaraciones juradas o deposiciones. *Jusino et als. v. Walgreens,* 155 DPR 560, 579 (2001). De igual modo, no es apropiado resolver por la vía sumaria "casos complejos o casos que involucren cuestiones de interés público". *Íd.*

Nuestro más Alto Foro ha expresado que, el promovido puede derrotar un petitorio sumario demostrándole al tribunal que no ha podido realizar un descubrimiento de prueba adecuado. A esos efectos, habrá de establecer que, la solicitud de sentencia sumaria es prematura porque el descubrimiento ha sido inadecuado, está a medias o no se ha realizado.

Como es sabido, acoger un petitorio sumario de forma prematura puede tener el efecto de privar a la parte promovida de sus derechos, sin un debido proceso de ley. Las propias Reglas de Procedimiento Civil proveen para que, en el ejercicio de su discreción, el tribunal posponga la evaluación de un petitorio sumario o lo deniegue en esa etapa de los procedimientos, cuando la parte promovida no ha tenido la adecuada oportunidad de conseguir prueba para apoyar alguno de los hechos esenciales que justifican su oposición

En armonía con lo anterior, la Regla 36.6 de las Reglas de Procedimiento Civil, 32 LPRA Ap. V, R. 36.6, establece lo siguiente:

> [s]i de las declaraciones juradas de la parte que se oponga a la moción resulta que ésta no puede, por las razones allí expuestas, presentar mediante declaraciones juradas hechos esenciales para justificar su oposición, el tribunal podrá denegar la solicitud de sentencia [sumaria] o posponer su consideración, concediéndole a la parte promovida un término razonable para que pueda obtener las declaraciones juradas, tomar deposiciones, conseguir que la otra parte le facilite cierta evidencia o dictar cualquier otra orden que sea justa.

**B. Ley Núm. 80**

La Ley Núm. 80, *supra,* se adoptó para proveer un remedio justiciero a aquellos empleados que fueron privados injustificadamente de su trabajo, el cual consiste en una indemnización para suplir sus necesidades básicas. *Segarra Rivera v. Int'l Shipping et al.*, supra. A esos efectos, la Ley Núm. 80, *supra,* le impone al patrono el pago de una indemnización o mesada, a favor de aquel empleado que es despedido, sin justa causa. *Íd.* Al mismo tiempo, el Artículo 12 de la citada ley obliga al obrero presuntamente despedido injustificadamente a solicitar remedios al amparo de la Ley Núm. 80, *supra,* dentro del plazo de tres (3) años, contados a partir de la fecha de su despido. 29 LPRA sec. 185(l). Cabe señalar que, ante el silencio de la Ley Núm. 80, supra, relativo a cómo habrá de interrumpirse el referido término, sus efectos o si el mismo es susceptible de congelación, en *Díaz Santiago v. International Textiles,* 195 DPR 862, 876 (2016), el Tribunal Supremo resolvió que:

> [...] la notificación al patrono de la presentación de una querella por *discrimen* ante la Unidad Antidiscrimen tendrá el efecto de *interrumpir* el término prescriptivo de una reclamación por despido injustificado dispuesto en la *Ley 80* si la notificación de la querella cumplió con todos los requisitos de una reclamación extrajudicial efectiva, es decir: (1) si fue oportuna (la reclamación ocurrió dentro del término prescriptivo de tres (3) años que dispone la Ley 80); (2) si fue realizada por una persona con legitimación; (3) si el medio utilizado fue idóneo, y finalmente, (4) si existía identidad entre el derecho reclamado y el afectado por la prescripción.
>
> Sobre este último requisito, disponemos que existe identidad entre el despido discriminatorio y una reclamación por despido injustificado, debido a que el despido injustificado es un elemento esencial de la causa de acción por despido discriminatorio. Así, hemos reiterado que para que prospere una reclamación por discrimen el empleado debe haber probado el hecho básico de que fue despedido sin justa causa.

Sobre lo que constituye justa causa para el despido, el Artículo 2 de la Ley Núm. 80, 29 LPRA sec. 185b, enumera varias circunstancias que afectan el buen y normal funcionamiento de una empresa, a saber:

Se entenderá por justa causa para el despido de un establecimiento:

(a) [...]

(b) [...]

(c) [...]

(d) Cierre total, temporero o parcial de las operaciones del establecimiento.

(e) Los cambios tecnológicos o de reorganización, o la naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público.

(f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido.

Sin embargo, esas seis instancias son sólo ejemplos de escenarios que pueden considerarse justa causa para el despido. *SLG Torres-Matundan v. Centro Patología,* 193 DPR 920, 930 (2015). La Ley Núm. 80, *supra,* no pretende ni puede considerar "la variedad de circunstancias y normas de los múltiples establecimientos de trabajo, ser un código de conducta que contenga una lista de faltas claramente definidas y la sanción que corresponda a cada una y en cada instancia." *Íd.* Por tanto, "los patronos están en libertad de adoptar los reglamentos y las normas razonables que estimen necesarias para el buen funcionamiento de la empresa y en las que se definan las faltas que, por su gravedad, podrían acarrear el despido como sanción. *Íd.,* págs. 930-931.

Cónsono con lo anterior, un patrono puede modificar su forma de hacer negocios a través de algún tipo de cambio dirigido a incrementar las ganancias del negocio, ya sea eliminando plazas, creando otras nuevas o fusionando algunas ya existentes para así poder enfrentar problemas financieros o de competitividad, siempre que responda a una restructuración *bona fide. SLG Zapata-Rivera v. J.F. Montalvo,* 189 DPR 414 (2013).

En la eventualidad de que se despidan empleados por las razones indicadas en los incisos (d), (e) y (f) del Artículo 2 de la ley antes citada, el patrono vendrá obligado a retener en el empleo, con

preferencia, a aquellos empleados de mayor antigüedad. Respecto a lo antes, el Artículo 3 de la Ley Núm. 80, 29 LPRA sec. 185c, establece lo siguiente:

> [e]n cualquier caso en que se despidiesen empleados o empleadas por las razones indicadas en los incisos (d), (e) y (f) de la sec. 185b de este título, el patrono estará obligado a retener con preferencia en el empleo a los empleados o empleadas de más antigüedad, siempre que subsistan puestos vacantes u ocupados por empleados o empleadas de menos antigüedad en el empleo dentro de su clasificación ocupacional que puedan ser desempeñados por ellos(as), entendiéndose que se dará preferencia a los empleados o empleadas despedidos(as) en caso de que dentro de los seis (6) meses siguientes a su cesantía tuviere necesidad de emplear a una persona en labores iguales o similares a las que desempeñaban dichos empleados o empleadas al momento de su despido y dentro de su clasificación ocupacional, siguiéndose también el orden de antigüedad en la reposición excepto, y en ambas situaciones, en aquellos casos en que haya una diferencia razonablemente clara o evidente en favor de la capacidad, competencia, productividad, desempeño, eficiencia o historial de los(as) empleados(as) comparados, en cuyo caso el patrono podrá seleccionar a base de dichos criterios. Disponiéndose, que:
>
> (a) En el caso de despidos o reducciones de personal por las razones contempladas en los incisos (d), (e) y (f) de la sec. 185b de este título en empresas que tienen varias oficinas, fábricas, sucursales o plantas, y en las que la práctica es que usual y regularmente los empleados o empleadas de una oficina, fábrica, sucursal o planta no se trasladan a otra, y que dichas unidades operan sustancialmente de forma independiente en cuanto a los aspectos de personal, la antigüedad de los empleados o empleadas dentro de la clasificación ocupacional objeto de la reducción de personal, se computará tomando en cuenta únicamente los empleados o empleadas en la oficina, fábrica, sucursal o planta en la cual se va a hacer dicha reducción de personal.
>
> (b) En el caso de empresas con varias oficinas, fábricas, sucursales o plantas en las cuales existe la práctica usual y regular de que sus empleados o empleadas se trasladan de una unidad a otra y que las distintas unidades operan de forma sustancialmente integrada en cuanto a los aspectos de personal, la antigüedad se computará a base de todos los empleados o empleadas de la empresa, o sea, tomando en consideración todas sus oficinas, fábricas, sucursales o plantas, que están en la clasificación ocupacional objeto de la reducción de personal.

El Tribunal Supremo ha establecido los factores a considerar al momento de surgir controversias con relación a clasificaciones ocupacionales en que se desempeña un empleado, a saber: (i) las funciones y los deberes del puesto; (ii) los requisitos para ocupar la plaza, incluyendo los conocimientos y las destrezas necesarias [,] así como la preparación académica; (iii) forma de compensación, y (iv)

forma en que se realiza el trabajo. *Díaz v. Wyndham Hotel Corp.*, 155 DPR 364, 371 (2001).[7]

De otra parte, antes de la aprobación de la Ley de Transformación y Flexibilidad Laboral, el Artículo 8 de la Ley Núm. 80, *supra*, 29 LPRA sec. 185k(a), disponía que "el patrono vendrá obligado(a) [sic] a alegar, en su contestación a la demanda, los hechos que dieron origen al despido y probar que el mismo estuvo justificado".

Respecto a esa disposición, el Tribunal Supremo expresó en *Feliciano Martes v. Sheraton*, 182 DPR 368, 385 (2011), que lo anterior invertía el orden de la prueba en casos civiles y le imponía al patrono el peso de demostrar que el despido fue justificado. Posteriormente, en *Romero et als. v. Cabrer Roig et als*, 191 DPR 643, 652 (2014), dispuso lo siguiente:

> "[f]inalmente, para adelantar el propósito de su naturaleza reparadora, la Ley Núm. 80, *supra*, invierte el orden de la prueba en casos civiles y le impone al patrono el deber de probar *in limine* que el despido fue justificado. Si así lo prueba, el patrono no estará obligado a pagar la mesada. Véase *Secretario del Trabajo v. I.T.T.*, 108 DPR 536 (1979). Además, la Ley Núm. 80, *supra*, dispone que, en toda acción instada al amparo de esta, el patrono estará obligado a alegar en la contestación a la demanda, los hechos que dieron origen al despido y probar que estuvo justificado para quedar eximido del pago de la indemnización que dispone esa ley. 29 LPRA sec. 185k(a). En otras palabras, la Ley Núm. 80, *supra*, establece una excepción a la norma general de derecho que dispone que en toda reclamación judicial instada por una parte contra un demandado, sea el reclamante quien tiene la obligación de probar sus alegaciones para prevalecer en un pleito. (Cita omitida.)

No obstante, el Artículo 4.9 de la Ley de Transformación y Flexibilidad Laboral, 29 LPRA sec. 185h, enmendó el Artículo 8 de la Ley Núm. 80, *supra*, a los fines de eliminar el origen de la presunción. Cónsono con esto, el Tribunal Supremo en *Ortiz Ortiz v. Medtronic*, 209 DPR 759 (2022), aclaró sobre quién recae el peso de la prueba. En lo pertinente, dispuso lo siguiente:

---

[7] Nota núm. 12.

> Ahora bien, "para disfrutar de la presunción generada por la Ley [Núm.] 80 hace falta, como elemento de umbral, que haya habido un despido". *Rivera Figueroa v. The Fuller Brush Co.*, supra, pág. 907. Por tal razón, "[el] demandante tiene la obligación de aportar prueba que establezca los hechos básicos que den lugar a la presunción". Íd., pág. 911.
> [...]
> Una vez activada la presunción estatutaria a favor del empleado, el patrono tiene el deber de presentar prueba para rebatir la presunción y, además, persuadir al juzgador mediante preponderancia de la evidencia. (Cita omitida.) *Ortiz Ortiz v. Medtronic*, supra, pág. 775.

Cabe destacar que, la ley aplicable es "la que estaba vigente cuando ocurrieron los hechos que dan lugar a la causa de acción". (Énfasis suprimido). *Ortiz Ortiz v. Medtronic*, supra, pág. 777.

### C. Discrimen en el empleo

Como se sabe, el Artículo II, Sec. 1 de la Constitución del Estado Libre Asociado de Puerto Rico promulga la igualdad de todos los hombres y mujeres ante la ley. Art. II, Sec. 1, Const. ELA, LPRA Tomo 1. Así, nuestra Ley Suprema expresamente prohíbe el discrimen por motivo de raza, color, sexo, nacimiento, entre otras. *Garib Bazaín v. Hosp. Aux. Mutuo et al.,* 204 DPR 601, 614 (2020). El discrimen es un trato desigual injustificado que una persona sufre por perjuicio o arbitrariedad, sin que exista un fundamento razonable para ello. *Íd.*, pág. 630.

Análogamente, la Ley Núm. 100, *supra*, también conocida como la Ley General contra el Discrimen en el Empleo, prohíbe a un patrono despedir, limitar o discriminar a un empleado suyo por razón de edad, raza, color, sexo, entre otras. *Segarra Rivera v. Int'l Shipping et al.*, supra. A esos efectos, la Ley Núm. 100, *supra*, establece una causa de acción civil como remedio para que la víctima del discrimen en el empleo pueda reclamar los daños sufridos como indemnización. *Ruiz Mattei v. Commercial Equipment Finance, Inc.*, 2024 TSPR 68, resuelto el 21 de junio de 2024. A pesar de que la reposición en el empleo es el remedio preferente y más completo ante un despido discriminatorio, esta no es siempre posible, lo cual redunda en daños económicos a favor del empleado

perjudicado. *Torres Rivera v. Econo Rial, Inc.*, 208 DPR 346, 358 (2021). A esos efectos, el empleado tendrá derecho a recibir compensación por los daños emocionales, económicos y por la pérdida de ingresos. *Íd.*

En lo pertinente y con respecto al término prescriptivo aplicable para instar una causa de acción bajo la Ley Núm. 100, *supra,* el Artículo 5 del referido precepto concede al empleado presuntamente discriminado un (1) año para reclamar sus beneficios, mediante la presentación de una querella administrativa ante el Departamento del Trabajo y Recursos Humanos o iniciando una acción judicial. El mencionado plazo puede interrumpirse al incoar una reclamación judicial o extrajudicial, o a través del reconocimiento de la deuda por parte del patrono o de su agente autorizado. 29 LPRA sec. 150; *Díaz Santiago v. International Textiles,* supra.

### III.

El apelante recurre ante esta Curia de la *Sentencia,* mediante la cual, el TPI desestimó sumariamente sus causas de acción, sobre despido injustificado y discrimen por edad en contra de MOP. Argumenta que, el foro primario incidió al concluir que el patrono logró demostrar que, su despido fue motivado por una reorganización *bona fide* de la empresa. Arguye además que, el foro primario erró al ignorar que, MOP no obedeció el orden de antigüedad y reinstaló al señor Luis Daniel Vázquez, para realizar las labores del apelante como pre-prensista. El apelante detalla que, a la fecha de su despido, tenía 56 años y una antigüedad en la empresa de 32 años, mientras que, el señor Luis Daniel Vázquez tenía 43 años y menor antigüedad en MOP. Por último, asegura que, el TPI no ponderó que persisten controversias sobre hechos medulares que impiden la adjudicación de la causa sumariamente.

En su alegato, MOP sostiene que no existe controversia sobre el impacto adverso que sufrió la empresa a causa del Huracán María que provocó la eventual reorganización de la empresa la cual resultó en la eliminación de posiciones y despido del apelante. Discute que, la causa de acción bajo la Ley Núm. 100, *supra,* -relacionada a las reducciones de jornada, efectuadas entre el 2013 y 2016- está prescrita. Añade a lo anterior que, el apelante nunca radicó una querella interna de discrimen por edad ante su patrono, ni tampoco ante el Departamento del Trabajo y Recursos Humanos. Arguye, además que, ante la incapacidad que concedió la Administración del Seguro Social al señor Febres Pizarro, sus causas sobre despido injustificado y discrimen por edad, derivadas de los actos de MOP posteriores al paso del huracán María, son académicas. Por su estrecha relación entre sí, discutiremos los errores conjuntamente.

Como se sabe, en virtud de la normativa expuesta, debemos revisar *de novo* la *Moción de Sentencia Sumaria* que presentó MOP y la correspondiente oposición del apelante, para así evaluar la determinación del foro primario. Primeramente, habremos de examinar si ambas partes cumplieron los requisitos de forma que establece la Regla 36, *supra.* Luego, considerar si existen hechos materiales en controversia que impiden la adjudicación de este asunto por la vía sumaria. Por último, aplicar y analizar el derecho correspondiente.

Puntualizamos que, los foros apelativos estamos en igual posición que el foro sentenciador al revisar un petitorio sumario. Según el derecho aplicable, la parte que se opone a que se declare con lugar una solicitud de sentencia sumaria está obligada a enfrentar la moción de su adversario de forma tan detallada y específica como lo ha hecho el promovente. Así, en su oposición, el promovido debe detallar aquellos hechos propuestos que pretende controvertir y hacer referencia a la prueba específica que sostiene

su posición, según lo exige la Regla 36.3 de Procedimiento Civil, *supra.*

Luego de constatar que ambas partes cumplieron sustancialmente con los requerimientos y formalidades de la Regla 36, *supra,* analizamos la procedencia de la defensa de prescripción que levantó MOP. Lo antes, con respecto a las alegaciones del señor Febres Pizarro sobre discrimen por edad, sustentadas en la reducción de la jornada laboral previo al evento atmosférico. Aún si evaluamos este asunto de la forma más favorable para el apelante (en vista que, la carta que él remitió al señor Miguel Colón Figueroa, el 23 de febrero de 2016, constituyó una reclamación extrajudicial que interrumpió el término prescriptivo) comoquiera la referida causa de acción está prescrita. Ello, en tanto y en cuanto, no presentó reclamación alguna ante los foros pertinentes y transcurrió en exceso del plazo aplicable de un (1) año entre el 23 de febrero de 2016 (fecha de la reclamación extrajudicial) y el 29 de octubre de 2018 (fecha de la presentación de la Querella de epígrafe).

Resuelto lo anterior, nos compete entonces atender las demás controversias propias de nuestro examen *de novo* del petitorio sumario de MOP y de la oposición del señor Febres Pizarro. En primer lugar, identificamos que no está en controversia el impacto económico adverso que el paso del huracán María tuvo sobre MOP y la determinación correspondiente a la reorganización operacional de la empresa. Sin embargo, en atención a las reclamaciones atinentes al alegado despido injustificado y discrimen por edad (con posterioridad al evento atmosférico) el apelante logró controvertir hechos medulares que impedían al foro primario adjudicar y desestimar la totalidad de la causa por la vía sumaria. Nos explicamos.

En la *Moción de Sentencia Sumaria,* el apelado incluyó 18 hechos estipulados y propuso 77 hechos incontrovertidos. En su

correspondiente oposición, el apelante objetó 42 de estos haciendo referencia a las declaraciones vertidas durante las deposiciones y a prueba documental.[8] A pesar de lo antes, el TPI concluyó que la prueba que presentó el apelante fue insuficiente para controvertir hechos demostrativos de la justa causa en la cual MOP fundamentó su despido. Cónsono con lo anterior, el foro primario entendió que MOP demostró la justa causa para el despido del apelante y, con ello, derrotó su causa de acción bajo la Ley Núm. 100, *supra*. Incidió en su proceder.

Con respecto a las propuestas de hechos que versan sobre los sucesos posteriores al evento atmosférico, relacionados a la ejecución de un plan de reorganización que no consta por escrito, resolvemos que, el apelante logró rebatirlas. Observamos que, el foro primario adjudicó asuntos de credibilidad por la vía sumaria, fundamentados esencialmente en los testimonios que el señor Febres Pizarro y el señor Carlos Colón Figueroa brindaron durante sus respectivas deposiciones. Sin embargo, de nuestro examen *de novo* constatamos que los referidos testimonios están encontrados, por lo cual, al ser asuntos que envuelven credibilidad, no deben resolverse por la vía sumaria. *Cruz Cruz y otra v. Casa Bella Corp. y otros,* supra.

A modo de ejemplo, según el señor Miguel Colón Figueroa, Gerente de MOP, las funciones del señor Febres Pizarro eran manejar la impresión de placas, elaborar muestras en el Departamento de Pre-prensa y dar mantenimiento a la máquina de placas tres veces al año.[9] Al contestar el primer pliego de interrogatorio hizo constar que, "[d]e no tener tareas relacionadas al Departamento de pre-prensa se le asignaban labores básicas de

---

[8] A continuación, las propuestas sobre hechos medulares a las cuales el apelante se opuso: 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 31, 32, 33, 34, 35, 36, 37, 38, 39, 41, 43, 44, 45, 50, 51, 52, 54, 56, 59, 60, 61, 62, 63, 64, 66, 67, 68, 69, 70, 76 y 77.

[9] Apéndice, pág. 581.

producción como aplicación de pega, atender un bolsillo de compaginación en equipo de encuadernación, compaginaciones simples de no más de dos referencias o la operación de los equipos de impresión Xerox."[10] Ahora bien, surge de la carta que dirigió al señor Febres Pizarro, con fecha de 1 de marzo de 2016, que, "[t]odos los trabajos que hemos impreso en los equipos Xerox han sido impresos por usted y no hemos utilizado a ningún otro personal para dicho propósito."[11]

De otra parte, el señor Carlos Colón Figueroa, declaró durante su deposición que las funciones del señor Febres Pizarro eran "stripping" o mascarillado, poner los negativos en placas y revelarlas.[12] De igual manera, atribuyó al apelante la preparación de muestras o "dummies", liberación de impresiones de placas, mantenimiento a la máquina de placas y labores básicas de producción.[13] Sin embargo, negó que, el apelante manejara prensas y que estuviese a cargo de la máquina Xerox.[14] También refutó que, el señor Febres Pizarro trabajara en el Departamento de Terminaciones, aunque sostuvo que, en ocasiones se le asignaban labores allí, nada habitual.[15]

Según el señor Febres Pizarro, él cubría el área que lo pusieran a trabajar.[16] No obstante, aseguró que, su trabajo principal era con la máquina Xerox.[17] Informó ser el encargado de hacer muestras o "dummies" y de hacer la liberación de placas, aunque reconoció que, en pocas ocasiones el señor Luis Daniel Vázquez las hacía.[18] Agregó que él se encargaba de buscar las pruebas en los

---

[10] Apéndice, pág. 1212.
[11] Apéndice, pág. 1061.
[12] Apéndice, pág. 157.
[13] Apéndice, págs. 164-165.
[14] Apéndice, págs. 157 y 173.
[15] Apéndice, pág. 226.
[16] Apéndice, pág. 389.
[17] Apéndice, pág. 389. Véase, además, las funciones que el señor Febres Pizarro se atribuyó en su carta fechada el 23 de febrero de 2016. Apéndice, pág. 1060.
[18] Apéndice, pág. 302-304. Incluso narró que observó al señor Luis Daniel Vázquez haciendo las muestras -durante su cesantía- cuando se personó en MOP, sin que a él se le hubiese llamado a retornar a sus labores.

archivos cuando se trataba de un trabajo repetido.[19] Expresó que, los equipos con los cuales más trabajaba eran la Xerox Nuvera, la máquina de hacer pruebas, la de las placas y la dobladora.[20] Aseguró ser el encargado de darle mantenimiento a las máquinas.[21]

De lo antes, resulta evidente que, lo expresado por el apelante y por el señor Carlos Colón Figueroa, en sus respectivas deposiciones, constituyen versiones incompatibles entre sí. Al mismo tiempo, contrastan con lo expresado por el señor Miguel Colón Figueroa en las distintas misivas que remitió al apelante. Tras nuestro análisis sobre lo anterior, resolvemos que estamos ante un asunto de credibilidad que amerita la celebración de un juicio plenario.

En cuanto a si MOP cumplió con el criterio de antigüedad, el señor Carlos Colón Figueroa declaró que, las tareas del señor Febres Pizarro le fueron asignadas al señor Luis Daniel Vázquez, luego de reconocer que, este último era menor y de menos antigüedad que el apelante.[22] Mientras que, el señor Febres Pizarro atestó que el señor Luis Daniel Vázquez y la señora Damarys García fueron restituidos en MOP para realizar las funciones que él hacía.[23] A lo antes añadió que, presuntamente MOP restituyó al señor Joel Rosado como ayudante de prensa a pesar de que, previo a la cesantía, ocupaba el puesto de chófer.[24]

Cabe puntualizar que, a solicitud del señor Febres Pizarro, al contestar el primer pliego de interrogatorio y requerimiento de documentos, MOP preparó una tabla que refleja los nombres de sus empleados, edad y posiciones al 20 de marzo de 2018, su fecha de nacimiento y de contratación.[25]. Sin embargo, de esta no surge a

---

[19] Apéndice, págs. 311-312.
[20] Apéndice, págs. 319-320.
[21] Apéndice, págs. 283-284.
[22] Apéndice, pág. 225.
[23] Apéndice, pág. 373.
[24] Apéndice, pág. 1033.
[25] Apéndice, pág. 1226.

cuál clasificación ocupacional pertenece cada empleado, lo cual es inherente al análisis de antigüedad que exige la Ley Núm. 80, *supra.* De manera que, el análisis de la referida tabla no resulta eficaz para determinar las funciones y la clasificación correspondiente al apelante.

Surge de la deposición del señor Carlos Colón Figueroa que, a partir del 1998, MOP tenía un organigrama, el cual se comprometió a producir.[26] Sin embargo, en autos, no obra una copia del organigrama de la empresa, ni fue anunciado como prueba documental en el *Informe de Conferencia con Antelación al Juicio.* Observamos, además, que tampoco surge del expediente, la descripción de las funciones de sus empleados, como parte del récord de negocio. Según el señor Carlos Colón Figueroa, la empresa carecía de una descripción de las tareas asignadas al señor Febres Pizarro,[27] las cuales se le asignaban diariamente,[28] mediante un itinerario.[29]

Es de notar que, el señor Miguel Colón Figueroa hizo constar en el correo electrónico que remitió al señor Febres Pizarro, el 9 de marzo de 2018, que las funciones que este realizaba, sobre impresión de placas y elaboración de muestras, eran inexistentes a la fecha de su alegado despido.[30] Lo antes contrasta con lo aseverado por el señor Carlos Colón Figueroa, quien aseguró que la posición que tenía el señor Febres Pizarro antes del huracán María no fue eliminada tras el evento atmosférico.[31] Cabe puntualizar que, el señor Miguel Colón Figueroa ejecutó el despido del apelante y estaba a cargo de los asuntos de recursos humanos de MOP, sin embargo, no ha sido objeto de deposición en este caso.

---

[26] Apéndice, pág. 168.
[27] Apéndice, págs. 162 y 1212.
[28] Apéndice, pág. 170.
[29] Apéndice, pág. 451.
[30] Apéndice, pág. 1533.
[31] Apéndice, pág. 205.

Resulta evidente que, el expediente ante nos está huérfano de un organigrama de la empresa, de un listado que incluya las funciones de cada empleado, los puestos eliminados como parte de la reorganización, las clasificaciones pertinentes, entre otros datos. De manera que, para dilucidar las controversias antes desglosadas es indispensable adjudicar credibilidad. El foro primario incidió al descansar en asuntos de credibilidad para resolver sumariamente que MOP logró establecer la justa causa para el despido del apelante. Regla 36.6 de Procedimiento Civil, *supra; Cruz Cruz y otra v. Casa Bella Corp. y otros,* supra.

Si bien es cierto que, según la normativa esbozada, basta con que el patrono acredite al Tribunal que la reorganización o reestructuración empresarial responde a una decisión gerencial válida y no a un mero capricho o arbitrariedad, el análisis no concluye ahí. Conforme a lo resuelto en *SLG Zapata-Rivera v. J.F. Montalvo,* supra, y *Díaz v. Wyndham Hotel, Corp.,* supra, una vez el patrono determina modificar su forma de hacer negocios dirigida a incrementar ganancias, mediante una restructuración *bona fide*, ya sea eliminando plazas, creando otras o fusionando las existentes, procede determinar si cumplió con la retención de empleados de mayor antigüedad en una clasificación ocupacional. Por disposición estatutaria, en cualquier caso, en que se despidan empleados por esta razón, el patrono está obligado a retener, con preferencia en el empleo, a los empleados de más antigüedad, siempre que subsistan puestos vacantes u ocupados por empleados de menos antigüedad dentro de su clasificación ocupacional.

Cabe señalar que, se dará preferencia a los empleados despedidos en caso de que, dentro de los seis meses siguientes a su cesantía, tuviere necesidad de emplear a una persona en labores iguales o similares a las que desempeñaban dichos empleados, al momento de su despido, dentro de su clasificación, siguiéndose el

orden de antigüedad en la reposición. Lo antes, salvo que exista una diferencia razonablemente clara o evidente, a favor de la capacidad, competencia, productividad, desempeño, eficiencia o historial de empleados comparados, en cuyo caso, el patrono podrá seleccionar a base de dichos criterios.

Tras revisar detenidamente las determinaciones de hechos que consignó el TPI resulta evidente que, el foro apelado no consignó, ni analizó en su dictamen hechos que atiendan de forma fehaciente esta disposición estatutaria. No se colige de la *Sentencia* impugnada que el foro primario analizó cuáles eran las funciones y deberes del apelante en comparación con las del señor Luis Daniel Vázquez y las de la señora Damarys García, a los fines de establecer si pertenecen a la misma clasificación ocupacional, independientemente de sus títulos. De hecho, el TPI incluyó como determinaciones de hechos ciertas alegaciones del apelante relacionadas a sus respectivas funciones, a pesar de que, meras alegaciones o teorías no constituyen hechos probados.[32] *Pereira Suárez v. Jta. Dir. Cond.*, 182 DPR 463, 509 (2011). Lo antes, obviando además que hubo versiones encontradas sobre este particular durante el proceso para identificar las clasificaciones ocupacionales de cada empleado en la empresa y el orden de antigüedad, según sus años de servicio. Lo antes es necesario al sopesar el criterio de antigüedad frente a aquellos empleados que pertenezcan a una misma clasificación ocupacional -debido a que poseen deberes y funciones similares-, independientemente de que sus títulos y remuneración sean distintos. Alberto Acevedo Colom, *Legislación Protectora del Trabajo Comentada*, 7ma Ed. Rev., San Juan, Ramallo Printing Bros., 2001, págs. 154- 160.

---

[32] En particular, las determinaciones de hechos números 65, 66, 72, 73, 74, 75, 89 y 90.

En ausencia del análisis de antigüedad que requiere el Artículo 3 de la Ley Núm. 80, *supra,* nos corresponde devolver este asunto ante el TPI, quien habrá de recibir prueba sobre las funciones y deberes del puesto que ocupaba el señor Febres Pizarro, los requisitos, conocimientos y destrezas inherentes a dicha plaza, la compensación y la forma en que se realizaba el trabajo, en comparación con las de quienes asumieron las labores con posterioridad a su alegado despido y los años de servicio de cada uno a modo de establecer su antigüedad. *Díaz v. Wyndham Hotel, Corp.,* supra. Lo antes es necesario para el foro primario estar en posición de concluir si MOP cumplió con las exigencias que establece nuestro derecho laboral. Tal cual adelantamos, a continuación, las controversias sobre hechos medulares que identificamos luego de nuestro examen sosegado del expediente:

- ¿Cuáles eran las funciones del señor Febres Pizarro en MOP previo a su alegado despido? (Hechos propuestos en controversia números 19, 73, 89.)
- Si el apelante o algún otro empleado estaban a cargo de la máquina Xerox Nuvera. (Hecho propuesto en controversia número 51.)
- Si el manejo de equipo de placas estuvo interrumpido y cuándo reanudó. (Hecho propuesto en controversia número 52.)
- ¿Cuál era el volumen comercial de los trabajos de impresión en la máquina Xerox antes y después del periodo de reserva? (Hechos propuestos en controversia números 52, 53, 74, 90.)
- Si el volumen de impresión en la máquina Xerox Nuvera era esporádico. (Hechos propuestos en controversia números 50, 77, 80.)
- ¿Al reiniciar sus operaciones, MOP realizó la determinación de reempleo por clasificación ocupacional, siguiendo el orden de antigüedad? (Hechos propuestos en controversia números 27, 41, 68.)
- Como secuela del evento atmosférico, ¿cuáles equipos de MOP sufrieron daños y su alcance? (Hechos en controversia números 31, 33, 40, 42)
- ¿En qué fecha MOP adquirió un equipo nuevo de impresión de placas con servicio y mantenimiento incluidos? (Hechos en controversia números 44, 45, 52.)
- ¿Cuándo comenzó el proceso de reempleo de los empleados que MOP había suspendido tras el cierre de sus operaciones? (Hecho en controversia número 35.)
- Si las labores que el apelante realizaba como operador de pre-prensa se tornaron en inexistentes, a partir del 9 de marzo de 2018. (Hechos en controversia números 37, 38, 39.)
- Si el señor Febres Pizarro era el único operador de pre-prensa. (Hecho en controversia número 67.)

- ¿Cuáles eran las funciones del señor Luis Daniel Vázquez y de la señora Damarys García en MOP? (Hechos en controversia números 47, 75, 76, 78, 79, 81, 83.)
- ¿Cuál era la frecuencia de los trabajos de terminaciones? (Hecho en controversia número 82.)
- Si MOP consolidó las tareas de pre-prensa y las asignó al señor Luis Daniel Vázquez, ¿cuándo lo hizo y cuál criterio utilizó para ello? (Hecho en controversia número 46.)
- ¿Cuáles otras plazas fueron eliminadas como parte del plan de reorganización? (Hecho en controversia número 55.)

En cuanto a la causa de acción de discrimen por edad, esta requiere de una previa determinación de que el alegado despido fue injustificado. De manera que, solo si el foro primario en su día adjudica que el alegado despido del señor Febres Pizarro fue injustificado, procede el correspondiente análisis de hechos y derecho sobre si MOP actuó de forma discriminatoria. De conformidad, el apelante podrá ser acreedor de los remedios que establece la Ley Núm. 100, *supra,* solo si el foro primario dictamina que su alegado despido fue injustificado y, también, discriminatorio.[33]

En cuanto a la alegada academicidad de la querella debido a que el señor Febres Pizarro recibe los beneficios del seguro social por discapacidad desde el 1 de septiembre de 2017, resolvemos que es un asunto prematuro. En su consecuencia, declaramos No Ha Lugar, la solicitud de desestimación interpuesta por MOP. Hasta tanto el TPI no dictamine si hubo o no una violación a la Ley Núm. 80, *supra,* no procede dilucidar a cuáles remedios el apelante cualifica. Cabe señalar que, en *Silva Soto v. Suiza Dairy Corp.,* 211 DPR 203, 213 (2023), el Tribunal Supremo resolvió que, los beneficios del seguro social por discapacidad no liberan necesariamente al patrono del pago de los salarios a los cuales se obligó.

---

[33] Lo antes se circunscribe a los sucesos ocurridos con posterioridad al azote del huracán María en Puerto Rico y no a las alegaciones sobre alegados actos discriminatorios por reducción de horas laborables con anterioridad al evento atmosférico, las cuales previamente dispusimos que están prescritas.

Al entender sobre la presente causa conforme nos exige la normativa establecida en *Meléndez González et. al. v. M. Cuebas*, supra, concluimos que, persisten controversias medulares que impiden la adjudicación del caso por la vía sumaria. En vista de lo anterior, concluimos que los errores señalados por el apelante se cometieron. A esos efectos, revocamos el dictamen apelado y devolvemos la presente causa ante el foro primario para que celebre una vista evidenciaria.

## IV.

Por los fundamentos antes expuestos, revocamos la *Sentencia* apelada y devolvemos el caso ante el foro primario para la continuación de los procesos, conforme a lo aquí resuelto.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones. La Jueza Cintrón Cintrón concurre con el resultado sin opinión escrita.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones